UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| OLIVIA C. MORTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:21–CV–077–CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| LIBERTY MUTUAL FIRE INSURANCE | ) | **AND ORDER** |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Liberty Mutual Fire Insurance Company ("Liberty"), [R. 16]. Plaintiff Olivia C. Morton filed a Response, [R. 18], and Liberty filed a Reply, [R. 19], and Supplemental Reply, [R. 22]. This matter is therefore fully briefed and ripe for review. For the reasons stated herein, the Court will grant Liberty's Motion for Summary Judgment, [R. 16].

## I.    BACKGROUND

### A.  The Policy

From April 5, 2019, to April 5, 2020, Liberty insured Morton's dwelling at 977 Waverly Drive, Lexington, Kentucky, pursuant to policy number H32-288-939295-00 9 2 ("the Policy").[1] [R. 16-1, p. 3; R. 18, pp. 3–4]; *see also* [R. 16-2 (the Policy)]. Under Section 1 – Perils Insured Against, the Policy explains that it provides coverage "against risk of direct loss to [Morton's

---

[1] The named insured on the Policy is "Olivia C. Lamarr." However, Liberty does not contest that Olivia Morton and Olivia Lamarr are, in fact, the same person. *See* [R. 16-1, p. 3 n.4].

dwelling], only if that loss is a physical loss to property." [R. 16-2, p. 13].[2] However, the Policy

listed certain types of loss that it did *not* insure against, including loss caused by:

> 2.(e). Any of the following:
> (1) Wear and tear, marring, deterioration;
> (2) Inherent vice, latent defect, mechanical breakdown;
> (3) Smog, rust or other corrosion, mold, wet or dry rot;
> . . .
> (5) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy . . . .

[R. 16-2, p. 13]. For purposes of this motion, Court will refer to this provision of the Policy,

contained at Paragraph 2.e of Section I – Perils Insured Against, as the "Exclusion Provision."

The Policy also contains an endorsement adding the following language to Paragraph 2.e:

> (9) Seepage meaning a gradual, continuous, or repeated seepage or leakage of water, steam, or fuel over a period of 14 days or more, resulting in damage to the structure, whether hidden or not.

*Id.* at 32. This provision then becomes Paragraph 2.e.(9) of the Exclusion Provision. *Id.* The

Court refers to Paragraph 2.e(9) as the "Seepage Exclusion Clause."

In Section I – Perils Insured Against, following the Exclusion Provision, the Policy

includes an additional term relating to certain losses ensuing from those causes listed in the

Exclusion Provision:

> If any of these [excluded causes of loss] cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

---

[2] For ease of reference, the Court cites to the page numbers of the Policy, rather than the page numbers of the exhibit containing the Policy.

*Id.* at 13. For purposes of this motion, the Court will refer to this specific provision as the "Ensuing Loss Clause."

The Policy also contains an endorsement that changes various terms of the Policy, including the above-cited Ensuing Loss Clause. *See id.* at 33–41. Under that endorsement, the Ensuing Loss Clause was edited as follows:

> If any of these cause **sudden and accidental** water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

*Id.* at 38 (emphasis added). The only change made to the Ensuing Loss Clause was the addition of the words "sudden and accidental," in bold above. To be clear, when the Court refers to the Ensuing Loss Clause, it refers to this revised version.[3]

Finally, in a section labeled Section I – Conditions, the Policy required Morton to take certain action "[i]n case of a loss to covered property." *Id.* at 15. For example, Morton was required to "give prompt notice to [Liberty] or [its] agent" and "[p]rotect the property from further damage." *Id.*

### B. The Damage to Morton's Dwelling

In or around late February 2020, Morton began to experience plumbing issues. *See* [R. 16-3, p. 2 (Apr. 23, 2020 entry) (noticing leak "at the end of February"); R. 16-4, p. 4 (stating plumbing issues began in "February or March")]. More specifically, Morton "noticed that there had been a leak going on in the bottom of her sink at the end of February." *See* [R. 16-3, p. 2

---

[3] In her Response, Morton refers to the ensuing loss clause on page 13 of the Policy instead of the revised version on page 38. *See* [R. 16-2, pp. 13, 38; R. 18, p. 10]. As noted above, the only difference between the two is that the revised version states "sudden and accidental water damage" as opposed to just "water damage." *Compare* [R. 16-2, p. 13], *with* [R. 16-2, p. 38]. However, the Court finds Morton's failure to reference the revised version immaterial.

(Apr. 23, 2020 entry)]. Prior to contacting Liberty about the matter, Morton tried to fix her plumbing problems through the assistance of her brother, an (unnamed) plumbing company, and a separate home warranty.[4] [R. 16-4, pp. 2–3]. However, none of the three were able to resolve the issues. *Id.*; *see also* [R. 16-3, p. 2 (Apr. 23, 2020 entry)]. Morton now contends that, on or about March 15, 2020, wastewater overflowed from her kitchen sink drain causing damage to her kitchen cabinets and floors.[5] [R. 18, p. 4; R .18-2, ¶ 3; R. 18-2, p. 3].

Liberty was first notified of Morton's plumbing troubles in late April 2020. [R. 16-3, p. 2]. Specifically, Liberty was alerted to Morton's plumbing difficulties on April 20, 2020, via Morton's Nation Law Firm representative, Attorney Jeannine Bains. [R. 16-3, p. 3]; *see also* [R. 16-1, pp. 3–4]. A few days later, on April 23, 2020, Morton spoke with a Liberty representative about her claim. *See* [R. 16-3, p. 2 (Apr. 23, 2020 entry); R. 16-4, p. 4]. Morton advised the representative about the leak that she noticed in February 2020 and her efforts to stop the leak but noted that her efforts "did not stop the leak from happening, and [the leak] continued." [R. 16-3, p. 2 (Apr. 23, 2020 entry)]. Morton further explained that "[s]he finally decided to file a claim for assistance on the plumbing repairs and to repair the damage done by the water this entire time it's been leaking." *Id.*

Upon investigation of Morton's claim, Liberty assigned Morton's property damage "a loss date of March 15, 2020." [R. 16-1, p. 3; R. 18, p. 1]. Liberty then issued Morton a coverage denial, explaining that the Policy did not cover Morton's property damage because of the

---

[4] This warranty provider is not associated with Liberty. *See* [R. 16–1, p. 9 ("[Morton] . . . worked with a warranty provider who is not associated with Liberty Mutual for purposes of making claims or repairs[.]")].

[5] In her response brief, Morton omits any reference to the plumbing issues that began in February 2020, and instead focuses on March 15, 2020 as the date her troubles began with an overflowing kitchen sink. [R. 18]. However, she does not dispute that she began having plumbing troubles in February 2020, and both her deposition testimony and Liberty's internal notes make clear that her troubles began in or around February 2020. [R. 16-3, p. 2; R. 16-4, p. 4]. Regardless, the precise start date does not affect the Court's analysis because, as explained below, the Court does not need to decide whether seepage occurred for more than fourteen days.

Seepage Exclusion Clause—that is, because it was caused by leakage/seepage that lasted over fourteen days. [R 16-3, p. 2 (Apr. 29, 2020 entries)].

### C.  The Present Lawsuit

On March 22, 2021, Morton filed suit in Fayette Circuit Court, claiming Liberty's "failure to pay for all of [her] losses is a material breach of contract." [R. 1-3, p. 2, ¶ 12]. That same day, Liberty successfully removed the case to this Court pursuant to 28 U.S.C. § 1332. [R. 1]. The parties thereafter entered into an Agreed Briefing Schedule, in which both parties stipulated "that [Liberty] issued a homeowner's insurance policy to [Morton] and that an exclusion contained in an endorsement to the policy presents questions of law and contract interpretation regarding coverage that may be addressed after limited discovery." [R. 12, p. 1]; *see also* [R. 14 (Amended Briefing Schedule Order)].

That limited discovery having concluded, Liberty now moves for summary judgment, [R. 16]. Liberty argues that Morton is not entitled to coverage under the Policy because (1) the exclusion for damage caused by continuous seepage applies, and (2) alternatively, Morton failed to give timely notice of the damage, resulting in prejudice to Liberty. *See* [R. 16]. In response, Morton briefly argues that the damage at issue did *not* result from seepage but was instead caused by a sudden overflowing of wastewater from her kitchen sink drain, which in turn was caused by wear and tear and deterioration. [R. 18, pp. 3, 10–11; R. 18-2]. She also clarifies that she "only seeks coverage for the cost of tearing out and replacing any parts of their home necessary to access and repair the failed plumbing system." *Id.* at 10. She argues that she is entitled to coverage for these costs under the Ensuing Loss Clause. *See id.* at 10. Lastly, with respect to Liberty's alternative notice argument, Morton argues that there is no evidence of

5

prejudice. *Id.* at 11–12. In response to these arguments, Liberty filed both a reply, [R. 19], and supplemental reply, [R. 22].

## II.     STANDARD OF REVIEW[6]

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48

---

[6] As discussed below, Kentucky's substantive contract law is applicable to this case; however, a federal court sitting in diversity applies the summary judgment standard set forth in Federal Rule of Civil Procedure 56, not Kentucky's summary judgment standard. *See McBride v. Acuity*, No. 5:10-CV-173, 2011 U.S. Dist. LEXIS 141498, *5 (W.D. Ky. Dec. 7, 2011) (citing *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993), *abrogated on other grounds in Hertz Corp. v. Friend*, 559 U.S. 77 (2010)).

F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Further, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III.   ANALYSIS

### A.  Rules of Interpretation

The Court has jurisdiction to hear this case because the parties are completely diverse under 28 U.S.C. § 1332. [R. 1, ¶ 5]. A federal district court sitting in diversity is required to apply the substantive law of the state in which it sits. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). The present case involves the interpretation of an insurance contract, and contract interpretation is a matter of state law. *See Transamerica Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995). Accordingly, the Court will apply the rules utilized by Kentucky courts to interpret and give meaning to insurance policies.

### B.  The Exclusion Provision

As mentioned above, Morton's Policy does not cover loss caused by "[s]eepage meaning a gradual, continuous, or repeated seepage or leakage of water, steam, or fuel over a period of 14 days or more, resulting in damage to the structure, whether hidden or not." [R. 16-2, pp. 13, 32]. In its Motion for Summary Judgment, Liberty argues that this Seepage Exclusion Clause (contained within the Exclusion Provision via an endorsement) bars coverage in this case. [R. 16-1].  More specifically, Liberty argues that Morton's damage was caused by a leak that began no later than March 2020 and which continued to leak or seep for over fourteen days. *See, e.g.*, *id.* at 9. In her Response, Morton argues that the water damage was not caused by continuous seepage but by a sudden "backup and overflow of wastewater" due to "the home's failed cast iron drain plumbing system." [R. 18, pp. 3–4]. For support, she submits an affidavit from her plumbing expert, Randy Stinnett ("Plumber Stinnett"). [R. 18-2 (Plumber Stinnett Affidavit)]. In that affidavit, Plumber Stinnett opines that

> the plumbing system at the home has failed because of **wear and tear, rust, deterioration, and corrosion**, resulting in scaling, cracks, breaches, back pitches, bellies, and channeling. As a result of the failed cast iron plumbing system, wastewater escaped from breaches in the drain plumbing system and caused water damage to the Property [on March 15, 2020].

*Id.* at 2 (emphasis added).

The Court need not decide whether the damage at issue was caused by continuous seepage, as argued by Liberty, or the deteriorated cast iron plumbing system, as argued by Morton, because both causes are listed in the Exclusion Provision of Morton's Policy. *See* [R. 16-2, p. 32]. The Seepage Exclusion Clause (contained within the Exclusion Provision) explains that the Policy does not cover losses caused by "[s]eepage meaning a gradual, continuous, or repeated seepage or leakage of water, steam, or fuel over a period of 14 days or more." [R. 16-2, p. 32]. The Exclusion Provision also explains that the Policy does not cover losses caused by "[w]ear and tear, marring, deterioration," or "rust or other corrosion." *Id.* at 13 (paragraph e(1) and (3)). Thus, regardless of whether the damage at issue was caused by continuous seepage (as argued by Liberty) or wear and tear, deterioration, and/or rust (as argued by Morton), the Exclusion Provision bars coverage.

### C.  The Ensuing Loss Clause

To be clear, while Liberty spends a significant portion of its responses arguing that Morton's damage was caused by continuous seepage, *see* [R. 19; R. 22], Morton expels little effort on this issue.[7] Instead, the bulk of her response brief focuses on the Ensuing Loss Clause. More specifically, she argues that, even if the Exclusion Provision is triggered, she is still entitled to coverage for her "tear out" costs under the Ensuing Loss Clause. As previously noted, that clause provides:

> If any of these [coverage exceptions in the Exclusion Provision] cause sudden and
> accidental water damage not otherwise excluded, from a plumbing . . . system . . . ,

---

[7] In fact, Morton devotes only two sentences to her argument. First, in the "summary" section of her brief, she states, without support or citation, that "[t]he evidence shows that Ms. Morton's loss was not caused by constant or repeated seepage or leakage of water." [R. 18, p. 3]. Later, she states, "At minimum, there is a question of fact as to whether the seepage exclusion even applies as argued by Liberty Mutual given the testimony in the affidavit of Plaintiff's plumbing expert, Randy Stinnett, 'Plaintiff's loss was not caused by constant or repeated seepage or leakage of water.'" *Id.* at 10–11 (quoting [R. 18-2]).

we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

[R. 16-2, p. 38].

In her Response, Morton interprets the clause to mean that "*any* resulting loss from [an excluded cause, like seepage or wear and tear] [8] is insured" and "that if that loss is caused by water, the cost of tearing out and replacing any part of the building necessary to repair the plumbing system is covered." [R. 18, p. 10 (emphasis added)]. In accordance with this interpretation, Morton asserts that even if her water damage was a result of an excluded cause, she is still "entitled to coverage" under the Ensuing Loss Clause to "tear out and replace the parts of [her] home necessary to replace [her] failed plumbing system." *Id.*

Notably, this argument overlooks the "not otherwise excluded" language in the Ensuing Loss Clause. The first sentence of the clause makes clear that tear out coverage will only apply if any of the uncovered causes of loss in Section 2(e) cause "sudden and accidental water damage *not otherwise excluded*." [R. 16-2, p. 38]. By its very terms, "not otherwise excluded" means included, or covered by the Policy. Thus, the first sentence, as ordinarily defined, means that tear out coverage applies if any of the uncovered causes of loss in Section 2(e) (including continuous seepage as well as wear and tear, deterioration, rust, and/or corrosion) cause "sudden and accidental water damage" and that "sudden and accidental water damage" is, itself, covered under the Policy. [R. 16-2, p. 38]. Such interpretation is consistent with the Sixth Circuit's, which has explained that an ensuing loss clause

---

[8] Morton only cites seepage as an excluded cause when discussing the Ensuing Loss Clause, but based on her own expert's opinion, the Court understands that she argues that the cause of her loss was wear and tear, deterioration, rust and/or corrosion, which is also an excluded clause, as noted above. Regardless, Morton's primary argument is that, even if the Exclusion Provision applies, she is entitled to "tear out" costs under the Ensuing Loss Clause. [R. 18]. In fact, as already noted, she asks only for the costs of tearing out and replacing those parts of her home necessary to reach her failed plumbing system. *Id.* at 10.

"provides coverage for specific types of losses *that are otherwise covered in the policy* when that loss is the result of an occurrence of an excluded peril." [11 Steven Plitt et al., *Couch on Insurance* § 153:70 (3d ed. 2019)]. For example, a policy may provide that it does not cover any loss caused by earth movement. However, any ensuing loss by fire which is *not* excluded or excepted is covered. This means the policy loss caused by fire that would not have occurred but for the earth movement." Thus, an ensuing loss clause may be aptly characterized as "an exception to [an] exclusion."

*O.L. Matthews, M.D., P.C. v. Harleysville Ins. Co.*, 826 F. App'x 508, 513 (6th Cir. 2020).[9] With this in mind, the Court rejects Morton's argument that the clause covers "*any* resulting loss from 'continuous repeated seepage or leakage,'" *see* [R. 18, p. 10] (emphasis added). Instead, the plain language of the clause makes clear that it covers only "sudden and accidental water damage" caused by one of the exclusions listed in Section I – Perils Insured Against, and only if that sudden and accidental water damage is not otherwise excluded under the Policy. *See* [R. 22, p. 11].

On this point, Morton argues that an excluded cause (either seepage or wear and tear, deterioration, rust, and/or corrosion) caused a "sudden and accidental event" to occur on or about March 15, 2020, when "wastewater backed up and overflowed from the cast iron drain plumbing system" in her home. *See* [R. 18, p. 4–5 (quoting [R. 18-2 (Plumber Stinnett Affidavit)]. Even assuming this overflow event was sudden and accidental, it only triggers the Ensuing Loss Clause coverage if it is not otherwise excluded under the Policy.

In this case, the Court finds that the overflow event that occurred on or about March 15, 2020, was otherwise excluded under the Policy. In a section entitled "Section I – Exclusions," the Policy explains that Liberty "do[es] not insure for loss caused directly or indirectly by any of

---

[9] In *O.L. Matthews, M.D., P.C.*, the excluded loss clause read as follows: "We will not pay for loss or damage caused by or resulting from any of the following [exclusions]. But if an excluded clause of loss that is listed in [this section] results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss." 826 F. App'x at 513.

the following," and further clarifies that "[s]uch loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss." [R. 16-2, p. 14]. Among the listed exclusions is "Water Damage,"[10] which includes events like floods, tidal waves, and "overflow of a body of water." *Id.* at 15. Also included in the "Water Damage" provision is "[w]ater which backs up through sewers or drains or which overflows from a sump." *Id.* In this case, Morton describes the March 15, 2020 overflow event as follows: "On or around March 15, 2020, the home owned by Olivia Morton was damaged by wastewater that backed-up and overflowed from the home's failed cast iron drain plumbing system, and back[ed] up through the kitchen drain." [R. 18, p. 1]. In fact, she refers to the March 15, 2020 event as a back-up and overflow, backup, or overflow not less than eleven times in her response brief. *Id.* at 1, 2, 4, 9, 11. Moreover, her own expert states that in March 2020, "wastewater backed up and overflowed from the cast iron drain plumbing system." [R. 18-2, p. 3]. Thus, by Morton's own description and her own expert's opinion, the March 15, 2020 event is excluded under the Policy, specifically, Section I – Exclusions, even assuming it was sudden and accidental. As a result, the damage resulting from the March 15, 2020 overflow event is not covered by the Ensuing Loss Clause. *See generally O.L. Matthews, M.D., P.C.*, 826 F. App'x 508.

Because the Court concludes that Morton's property damage is not covered by the Policy, the Court will not address Liberty's alternative argument that Morton is not entitled to coverage because she failed to provide Liberty proper notice of the leak. *See* [R. 16-1, pp. 9–11; R. 22, pp. 13–14].

---

[10] To be clear, this Water Damage provision lists only three very specific definitions of water damage. *See* [R. 16-2, p. 15]. Thus, it is possible for a policy holder to sustain "water damage not otherwise excluded" by the Policy, potentially triggering the Ensuing Loss Clause.

12

**IV.    CONCLUSION**

For the reasons stated above, the Court will grant Liberty's Motion for Summary

Judgment, [**R. 16**].  Accordingly, **IT IS HEREBY ORDERED** as follows:

1. The Motion for Summary Judgment filed by Defendant Liberty Mutual Fire

   Insurance Company, **[R. 16]**, is **GRANTED**.

2. A separate judgment shall issue.

This the 30th day of September, 2022.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY